(C. D. 1917)

MOSCAHLADES BROS., INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided September 26, 1957)

*Siegel, Mandell & Davidson (Sidney Mandell* of counsel) for the plaintiff.
*George Cochran Doub,* Assistant Attorney General (*William J. Vitale,* trial attorney), for the defendant.

Before JOHNSON and DONLON, Judges

DONLON, Judge: The issue before us is something of a conundrum. Are olives green, in the tariff sense, when they are immature; or, regardless of maturity, when they are green in color? Similarly, are olives ripe, in the tariff sense, when they are mature; or, regardless of maturity, when they have the dark, or black, color that is characteristic of maturity for some olives?

What olives are green and what olives are ripe has been a much litigated question. The issue is not new. What is new before us now, is that defendant has this time produced extensive testimony in an effort to prove a commercial designation, or meaning, of the words "green" and "ripe" that is different from the common meaning, as the common meaning of those words, as applied to olives, has been heretofore construed by our appeals court. The door was left open for such a test when that court, in *Moscahlades Bros., Inc.* v. *United States,* 42 C. C. P. A. (Customs) 78, C. A. D. 575, held that, *in the absence of proof of commercial designation,* the common meaning of "green" and "ripe" would be applied to olives for tariff purposes. The holding in that case was that immature olives are green olives and that mature olives are ripe olives.

Two protests are before us. They have been consolidated for trial (R. 7).

The merchandise of protest 158256–K is slashed Kalamata olives in brine. It was classified in liquidation as olives, not specially provided for, under paragraph 744 of the Tariff Act of 1930 and charged with duty at the rate of 5 cents per pound. Plaintiff claims that slashed Kalamata olives in brine should be classified as olives in brine, green, also under paragraph 744 of the Tariff Act of 1930, but dutiable at 20 cents per gallon; or, alternatively, that classification should be as olives in brine, ripe, also under paragraph 744, but dutiable at 30 cents per gallon.

The merchandise of protest 158257–K is Greek Salona olives in brine. These olives were classified in liquidation as olives in brine, ripe, under paragraph 744 of the Tariff Act of 1930 and charged with duty at the rate of 30 cents per gallon. It is plaintiff's contention that these olives should be classified as olives in brine, green, likewise under paragraph 744, but dutiable at 20 cents per gallon.

There are before us the records in three cases besides the current record. Considerable testimony has been adduced in the record of the two consolidated cases now tried. In addition, there has been incorporated in this record the record in *Moscahlades Bros., Inc.* v. *United States, supra,* and, in that case, there were incorporated the records in *A. G. Skourtsis* v. *United States,* 69 Treas. Dec. 522, T. D. 48218, and in *United States* v. *Union Olive Oil Co., Inc.,* 38 C. P. A. (Customs) 73, C. A. D. 442.

It was stipulated that the olives of protest 158256–K, slashed Kalamata olives, are similar in all material respects to the olives of protest 172480–K, that is, the olives of the earlier *Moscahlades* case (R. 7). It was also stipulated that the olives of protest 158257–K, Salona olives, are in all material respects the same as the olives of the *Union Olive Oil* case (R. 13, 14). While counsel were not precise in their stipulation of similarity of the instant merchandise to the merchandise of the *Moscahlades* and *Union Olive Oil Co., Inc.,* cases, it is assumed, from the record as a whole, that, in both protests before us, the olives, whether slashed or whole, were red to reddish brown to dark brown, or reddish or pinkish, in color; that they were picked before full maturity; and that the process of preparation includes, whether or not the olives were cut or slashed or left whole, placement "in vats of a brine solution for several weeks' duration, after which they are placed in barrels, filled with brine, ready for shipment." (*Moscahlades* record, incorporated here, p. 8.)

The objective of cutting or slashing the olives is alleged to be an acceleration of processing. There may be an issue which involves

the tariff consequences of cutting or slashing, but we defer its consideration until we have disposed of the principal issue.

The earlier *Moscahlades* decision, *supra*, is *stare decisis* of the issue here as to whether these olives are, for tariff purposes, green or ripe, unless there is proved a commercial designation that is different from the common meaning, as it was construed by our appeals court in that case. It was there held that no commercial designation of olives in brine, *green*, or olives in brine, *ripe*, had been shown in the record then before the court. As we have stated, that record included, by incorporation, the records in the *Skourtsis* and *Union Olive Oil Co., Inc.*, cases, *supra*. Therefore, if commercial designation has now been shown, it is by evidence newly introduced here.

The burden of proof as to commercial designation is, in these cases, on the Government. The issue is before us because the Government has failed to follow the ruling of our appeals court in the *Moscahlades* case (C. A. D. 575), contending for a commercial designation different from the common meaning, as construed in that case.

Plaintiff rested, after incorporating the records above mentioned and identifying the merchandise here with the merchandise of the incorporated cases. Defendant then called 19 witnesses to testify as to the commercial designation asserted in liquidation. Plaintiff called three witnesses in rebuttal, on the issue of commercial designation. That is the testimony which is before us and which we now proceed to analyze and weigh.

Five of defendant's witnesses were professors (two), a chemical engineer, a grower and student of olives, and an olive processor. They testified as expert technical witnesses. Their testimony is not relevant to the issue of commercial designation, as it relates rather to the picking and processing of olives than to their trade. It is not essentially different from like testimony that was before the court in the *Moscahlades* case, *supra*, which evidence was held not to establish commercial designation. Defendant has not furthered its case by repetition of such evidence.

As to the testimony adduced in support of a commercial designation of olives by color, green or ripe, we weigh such evidence by the rule as to commercial designation that was long ago laid down by the Supreme Court. This rule has not since been stated more clearly than it then was.

* * * The object of the duty laws is to raise revenue, and for this purpose, to class substances according to the general usage and known denominations of trade. Whether a particular article were designated by one name or another, in the country of its origin, or whether it were a simple or mixed substance, was of no importance in the view of the legislature. It did not suppose our merchants to be naturalists, or geologists or botanists. It applied its attention to the description of articles, as they derived their appellations in our own markets.

in our domestic as well as our foreign traffic. And it would have been as dangerous as useless, to attempt any other classification, than that derived from the actual business of human life. Bohea tea, then, in the sense of all our revenue laws, means that article which, in the known usage of trade, has acquired that distinctive appellation. And even if the article has undergone some variations in quality or mixture, during the intermediate period from 1789 to 1816, when the last act passed, but still retains its old name, it must be presumed that congress, in this last act, referred itself to the existing standard, and not to any scientific or antiquated standard. [*Two Hundred Chests of Tea*, 22 U. S., 9 Wheat., 430 (1824), at p. 438.]

The reason for this rule was stated by our appeals court in *United States* v. *Fung Chong Co.*, 34 C. C. P. A. (Customs) 40, C. A. D. 342, at page 42, as follows:

The rule as it has been established "was intended to apply to cases where the trade designation is so universal and well understood that the Congress, and all the trade, are supposed to have been fully acquainted with the practice at the time the law was enacted." *Jas. Akeroyd & Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 440, T. D. 42641.

It is a part of the burden of proof of commercial designation, that commercial designation must be shown as of the time of the statutory enactment. In issues arising under the Tariff Act of 1930, commercial designation is applicable to resolve classification controversy only if the commercial designation is shown to have existed on and immediately prior to June 18, 1930. *Wilbur-Ellis Co. et al.* v. *United States*, 18 C. C. P. A. (Customs) 472; *United States* v. *Baltimore and Ohio R. R. Co.*, 16 Ct. Cust. Appls. 180. Evidence must be weighed as to time, as well as substance.

The rule is further circumscribed by the principle that "the proof of commercial designation must be made of the exact statutory word or words." *United States* v. *Julius Wile Sons & Co.*, 22 C. C. P. A. (Customs) 267.

Fourteen witnesses testified for defendant as to their understanding of the terms "green" and "ripe," as used in trade in olives in the United States. They were, variously, managers and buyers employed by firms dealing in food products; proprietors of grocery and delicatessen stores; officers of corporations doing business as supermarkets; officers of firms in the domestic business of producing, packing, and processing olives; and several importers of general food products, including olives.

The witnesses uniformly testified that, in their experience, ripe olives have always been known in the trade by the distinctive color, black or dark brown; that green olives have always been known in the trade by the distinctive color, green; and that Kalamata olives and Salona olives would not be accepted as a good delivery of an order for green olives in brine, because they are not green in color. The record shows conflict in testimony as to whether Kalamata olives and

Salona olives would be accepted as good delivery of an order for ripe olives in brine. Some of defendant's witnesses, including those who never had traded in Greek olives, stated that both Kalamata and Salona would be accepted as ripe olives in brine. Others would accept the Salona, but not the Kalamata, but this position as to the latter was because they were slashed olives and not because of color. Several witnesses would accept neither as ripe olives, because, in their experience, the California processed ripe olives, with which they were familiar, were ripe olives. Other witnesses stated they were not qualified to answer as to whether Kalamata and Salona olives were acceptable in the olive trade as ripe olives.

The weight of evidence seems clear that the tariff words "green olives in brine" and "ripe olives in brine" are not commercial designations by which olives are bought and sold in the trade. The evidence is that olives are rarely, if ever, ordered by those designations. Olives which are black or dark brown in color are ordered as California black olives, or as black olives, or as California ripe olives. Olives which are green in color are ordered as Spanish or Sicilian olives and are further designated as "Queens" or "Manzanillas." There is testimony, on cross-examination, that no uniformity exists in the billing or ordering of olives in the trade. Kalamata olives and Salona olives, such as those here involved, are ordered as Kalamatas and as Greek olives, respectively.

Moreover, the qualifications of defendant's witnesses to testify as to commercial designation of olives are not impressive. Most of them admitted to a limited experience in the olive trade on or about June 17. 1930, which is the significant time. Their testimony of trade understanding as of that date was often in the narrow reference of a local retail business. This does not establish that a definite, uniform, and general commercial designation for "green" or "ripe" olives existed in the United States in June 1930, when the Tariff Act of 1930 was enacted.

Plaintiff's rebuttal witnesses, with more experience in the olive trade in June 1930, testified that there was no commercial meaning or designation of green or ripe olives in the trade, different from the common meaning.

What, then, did Congress have in mind, in enacting the Tariff Act of 1930, by the terms "olives in brine, green" and "olives in brine, ripe?" These terms were new in the Tariff Act of 1922. In the Summary of Tariff Information, 1921, the important change proposed in classification of olives was stated as follows (p. 732): "Because of the *distinctive trade* in ripe, green, and pitted or stuffed olives, special provision has been made for each of these classes." [Emphasis supplied.] What was that "distinctive trade"?

The same summary (at pp. 730, 731) throws some light on what Congress, in enacting the 1922 statute, understood the meaning of "green" and "ripe" olives to be. The reason for the tariff change is suggested in the following summary excerpt:

Domestic olive culture is confined to California and small areas in Arizona, with a total acreage of about 1 per cent of the Spanish or Italian crop. *Only recently* has the industry been firmly placed, and its present status is due largely to improvements in growing and handling, especially in pickling the ripe olive, in which the United States has virtually a monopoly. Competing countries have not produced ripe olives, partly because of the presence of the olive fly, which honeycombs the ripe fruit. Domestic producers have had little success in pickling green olives. [Emphasis supplied.]

In the Summary of Tariff Information, 1929, which was before Congress when the Tariff Act of 1930 was under consideration, there is further material relative to green and ripe olives. The tariff provision under consideration, paragraph 744 of the Tariff Act of 1930, is substantially the same as paragraph 744 of the 1922 act, except that in the 1930 act there is the added provision for "Olives: * * * not specially provided for," a provision lacking in the 1922 act.

Under the heading "Olives in Brine, Green," the 1929 summary states (pp. 1276–1278):

Description and uses.—Olives are grown extensively in practically every country bordering on the Mediterranean Sea. They are also cultivated in many other countries in Asia and South America. In the United States the production is practically all in California, with a small production in Arizona. The main use for olives in foreign countries is for the manufacture of olive oil, a relatively small portion of the crop being used for the preparation of green or ripe olives. In the United States the principal use is for ripe pickled olives. For the preparation of green olives in brine the fruit is picked after it has reached full size, but before it has ripened sufficiently to become tender. Fruit of an entirely green or straw color are preferred. In Spain the picking season begins about September 15, and lasts until about November 1. After picking, the fruit is sorted to remove ripe, injured, and other undesirable olives. The green olives are then placed in concrete or brick lined vats and treated with a solution of lye to remove the bitter taste of the olives. They are then thoroughly washed with cold water after which the olives are placed in large hogsheads which are then filled with brine. The barrels are rolled out into the sun and the olives allowed to ferment until gas is no longer given off. The process of fermentation takes a month or longer, and may be described as a lactic acid fermentation. Properly fermented olives will keep for two years or more when packed in brine in sealed barrels. After fermentation the olives are graded for quality and size. Three quality grades are made: First quality, second quality, and culls. Very little of the second quality and none of the culls are exported to the United States. Only two kinds of olives are generally known in the trade, Queens and Manzanillos. These names have no direct connection with the trees on which the fruit is produced. In grading for size, the number of olives to a kilo (2.2 pounds) are stated. Queen olives are larger than Manzanillos and run in size from 60 to 220 olives to the kilo. Large Queen olives range from 70 to 100 per kilo; medium from 100 to 140; small, 140 to 220. Manzanillos usually run from 200 to 400 olives per kilo. Large manzanillos range from 200 to 220 olives per kilo; medium, 240 to 260; small, 280 to

400. Green olives are usually shipped from Spain to the United States in hogsheads containing about 970 to 1,000 pounds of the fruit. Green olives in brine are used in the household; in the manufacture of various food products; and for stuffing after pitting.

**Production.**—Spain is the leading producer of green olives in brine. In California there has been some experimental production. Spain and Italy lead in world production of olives. The total production in Spain and Italy and production for edible olives in Spain follow:

[Table not quoted.]

Of the total production of olives in California varying percentages have been used for olive oil, but the bulk of the crop is marketed as ripe olives. Production in California, quantity used for olive oil, and estimated bearing acreage, follow:

[Table not quoted.]

**Imports.**—Spain is the principal source of green olives in brine. In 1927 Spain supplied practically all of the imports. The imported green olives are repacked in the United States in small bottles and jars. The work requires large amounts of hand labor, bottles, caps, etc. In 1925 it was estimated that the total value of these products was $6,377,495. Prior to 1924 imports of green olives in brine were not shown separately. Statistics of imports of green olives in brine follow:

[Table not quoted.]

**Exports.**—Exports of domestic olives are not reported in the official statistics. There are small exports with benefit of drawback of imported olives in brine which have been repacked in the United States. In 1926 there were thus exported 15,405 gallons.

**Prices.**—No prices are available for domestic green olives. Average monthly wholesale price in New York of Spanish medium size (120–130 per kilo) green olives in brine follow:

[Table not quoted.]

**Competitive conditions.**—There is no important competition between imported and domestic green olives in brine. There appears to be no general agreement of opinion as to whether there is competition between the imported green olives and the domestic canned ripe olive. The two are different in taste, appearance, and methods of preparation. (See Ripe olives.)

## With respect to "Olives in Brine, Ripe," the 1929 summary states (pp. 1278, 1279):

**Description and uses.**—Ripe olives are harvested just before full maturity to avoid bruising the fruit. In the United States the ripe olives are used for three purposes: (1) The production of canned ripe olives, (2) dried ripe olives, and (3) olive oil. In foreign countries the main use is for olive oil, but there is a considerable production of dried ripe olives in Greece and Italy. (See green olives, and olive oil.)

**Production.**—In the United States ripe olives to be canned are placed in a lye solution to remove the tannin; allowed to aerate to develop the deep brown color; washed with cold water to remove the lye; graded for size; and then packed in brine, in cans or bottles, and sterilized. There is no similar production in any other country. Estimates of the California pack of canned ripe olives follow:

[Table not quoted.]

**Imports.**—Imports of ripe olives are packed in brine and are prepared differently from the canned olives in California. The Greek process is customarily employed.

The dead-ripe black olives are placed in a barrel with alternate layers of salt, and the barrel is sealed up when full. The barrel is placed on its side and rolled intermittently for about two months. The olives are then removed and repacked with brine in 50-gallon barrels. Imports of such ripe olives in brine were combined with green olives in brine until 1923; since then they have been shown separately. Imports come chiefly from Greece and Italy. Statistics of imports of ripe olives in brine follow:

[Table not quoted.]

**Exports.**—No exports of domestic ripe olives are recorded in the official statistics.

**Prices.**—Prices for imported ripe olives in brine are not available. California canned olives are marketed in a number of different sized cans and bottles, and in a number of different grades depending on the size of the olive. Prices of California canned ripe olives, per dozen pint cans of extra large size, f. o. b. plant in California follow:

[Table not quoted.]

We are of opinion that defendant has not proven a "distinctive appellation," under the Tariff Act of 1930, for "green" and "ripe" olives, within the rule laid down by the Supreme Court in the *Two Hundred Chests of Tea* case, *supra*. The previous *Moscahlades* case is, in our view, *stare decisis* of the issue before us, failing proof of commercial designation. However, it is not necessary to rest our decision solely on *stare decisis*. It seems clear, from the data that was before it in the tariff summaries, that Congress had in mind, in using the terms here litigated, immature olives as green olives and mature olives as ripe olives. We so hold.

There remains for our consideration the argument, advanced by defendant, that the cutting or slashing of Kalamata olives, in brine, has changed their tariff classification from olives in brine, to olives, not specially provided for. Our court of appeals, in the previous *Moscahlades* case, *supra*, decided this very issue, stating (p. 80):

* * * The slashing and subsequent treatment of the olives do not, in our opinion, advance them in condition or characterize them as being other than what is commonly regarded as a whole olive. * * *

The slashed Kalamata olives, subject of this action, were imported *in brine* and are properly to be classified as olives in brine. This position, supported by the *Moscahlades* decision, *supra*, is further reinforced by a series of decisions reviewed in our recent opinion in *Anderson Organization* v. *United States*, 38 Cust. Ct. 343, C. D. 1885. Mere mechanical change in an article, by cutting or slashing, does not result in change of that article, for tariff purposes, from the classification that is appropriate for the whole article, to a general, or not specially provided for, classification.

For the reasons herein stated, the merchandise of these protests is held entitled to classification under paragraph 744, as olives, in brine, green. Judgment will be rendered accordingly.